# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

DAMILOLA ANIMASHAUN,

                                                    Plaintiff,

         v.                                                        9:18-CV-1119
                                                                   (GLS/ATB)

CORRECTION OFFICER REGNER,

                                                    Defendant.

DAMILOLA ANIMASHAUN, Plaintiff, pro se
KONSTANDINOS D. LERIS, Asst. Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). This action was originally filed by plaintiff in the Western District of New York on January 25, 2017. (Dkt. No. 1). Defendant's motion to transfer the case to the Northern District of New York was granted on August 14, 2018, and the case was transferred on September 18, 2018. (Dkt. Nos. 25, 26). Plaintiff's motion for "default judgment" was denied on October 29, 2018, and a Mandatory Pretrial Discovery and Scheduling Order was issued by this court on November 8, 2018. (Dkt. Nos. 29, 30). Plaintiff's motion for reconsideration was denied on January 28, 2019. (Dkt. No. 34).

     Presently before this court is the defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 36). Plaintiff has responded in opposition to the motion, and defendant has replied. (Dkt. Nos. 38, 39). On September 3, 2019, this court accepted plaintiff's "sur-reply" and has considered the arguments therein. (Dkt.

Nos. 41, 42).  For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## I.    <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## II.    **Facts**

In his complaint, plaintiff alleges that on August 18, 2016, he was incarcerated in C-Block at Auburn Correctional Facility. (Complaint ("Compl.") at 5).  Plaintiff states that defendant Regner was "upset" because plaintiff was incarcerated for a crime that defendant Regner "disliked."  Plaintiff states that defendant Regner came to plaintiff's cell at approximately 2:00 a.m. and "spat multiple times on [him]." (*Id.*)  Defendant Regner then left, but came back shortly thereafter and threw an "unknown substance" on plaintiff which immediately irritated plaintiff's skin, causing itching, burning, reddening, discoloration, and a rash. (*Id.*)

Plaintiff states that he is asserting "Failure to Protect," which this court has interpreted as an Eighth Amendment excessive force/cruel and unusual punishment claim.  Plaintiff seeks ninety million dollars in damages for his injuries. (*Id.*)

Defendant's recitation of the events of August 18, 2016 is very different than plaintiff's description.  Defendant Regner states that he was working the overnight shift, assigned to C-Block, and at approximately 2:05 a.m., during one of his rounds of the block, defendant Regner noticed that plaintiff had a blanket hanging from his cell gate which was obstructing the view into plaintiff's cell. (Regner Decl. ¶ 6) (Dkt. No. 36-10).  It is against facility rules to obstruct visibility into an inmate's cell, room, or cube.  Defendant Regner gave plaintiff a direct order to remove the blanket. (*Id.*) However, plaintiff refused to do so. (*Id.*)  After plaintiff refused to remove the blanket, defendant Regner removed the blanket himself by grasping it from outside plaintiff's

3

cell. (Regner Decl. ¶ 7).  As defendant Regner took the blanket down, plaintiff threw the contents of a lotion bottle on defendant Regner.[1] (*Id.*)  The substance covered parts of defendant Regner's upper body, lower body, and head.[2] (*Id.*)

As a result of plaintiff's conduct, defendant wrote a misbehavior report against the plaintiff.  The misbehavior report described the incident and charged plaintiff with six rule violations, including refusing a direct order, disorderly conduct, obstructing the visibility into his cell, and assault. (Regner Decl. ¶ 8 & Ex. A).  The misbehavior report indicates that plaintiff was taken to the Special Housing Unit ("SHU") as a result of the incident. (Regner Decl. Ex. A) (Dkt. No. 36-11).  Defendant Regner asserts that he did not verbally harass or physically assault plaintiff in any way, nor did he ever throw any type of substance on plaintiff.[3] (Regner Decl. ¶ 10).

## III.   **Exhaustion of Administrative Remedies**

### A.   **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the

---

[1] The substance was white and smelled like lotion. (Regner Decl. ¶ 7).

[2] Defendant Regner wrote a memorandum, summarizing the incident and noted that he gave his shirt to a Sergeant so that it could be placed in the "evidence locker." (Regner Decl. Ex. A at 2).

[3] Defense counsel has also filed a copy of plaintiff's deposition. (Leris Aff. Ex. A) (Dkt. No. 36-2). To the extent that additional facts become relevant to this Report-Recommendation, I will discuss them below.

subject matter of the claim.[4]  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), abrogated on other grounds by *Ross v. Blake,* 380 F. 3d. 670 (2004)  (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y.

---

[4] In his memorandum of law, plaintiff included a paragraph, arguing that he is not required to exhaust claims of excessive force. (Dkt. No. 38 at 17). Plaintiff cites to a case that is no longer good law.  The exhaustion requirement applies to all claims, regardless of the subject matter. *Giano, supra.* Plaintiff also cites more recent cases and includes relevant arguments based on "unavailability."  The court has read plaintiff's opposition documents liberally to be based on the correct arguments.

Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the

IGRC may be appealed to the Superintendent of the Facility.  *Id.* § 701.5(c).  Adverse

decisions at the Superintendent's level may be appealed to the Central Office Review

Committee ("CORC").  *Id.* § 701.5(d).  The court also notes that the regulations

governing the Inmate Grievance Program encourage the inmate to "resolve his/her

complaints through the guidance and counseling unit, the program area directly

affected, or other existing channels (informal or formal) prior to submitting a

grievance."  *Id.* § 701.3(a) (Inmate's Responsibility).  There is also a special section for

complaints of harassment.  *Id.* § 701.8.  Complaints of harassment are handled by an

expedited procedure which provides that such grievances are forwarded directly to the

Superintendent of the facility, after which the inmate must appeal any negative

determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

     Until recently, the Second Circuit utilized a three-part inquiry to determine

whether an inmate had properly exhausted his administrative remedies.  *See Brownell v.*

*Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380

F.3d 680, 686 (2d Cir. 2004).  The *Hemphill* inquiry asked (1) whether the

administrative remedies were available to the inmate; (2) whether defendants' own

actions inhibiting exhaustion estops them from raising the defense; and (3) whether

"special circumstances" justify the inmate's failure to comply with the exhaustion

requirement.  *Id.*

     The Supreme Court has now made clear that courts may not excuse a prisoner's

failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S.

Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id; see also Riles*, 2016 WL 4572321 at *2. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

## B.  Application

Defendant argues that plaintiff failed to exhaust his administrative remedies because he never filed a grievance regarding the alleged "assault," notwithstanding his prior knowledge and use of the grievance process. Defendant supports his argument with a declaration from Cheryl Parmiter, the IGP Supervisor at Auburn. (Parmiter Decl. ¶ 1) (Dkt. No. 36-3). IGP Supervisor Parmiter states that plaintiff successfully attended Auburn's orientation program, wherein inmates are introduced to grievance procedures and how to use them at Auburn, including how the grievance program may be accessed by inmates incarcerated in a Special Housing Unit ("SHU"). (Parmiter Decl. ¶¶ 6, 11 & Ex. A).

7

IGP Supervisor Parmiter also states that she reviewed plaintiff's grievance files, and that plaintiff never filed a grievance related to the claim that he was assaulted by defendant Regner on August 18, 2016 at Auburn. (Parmiter Decl. ¶ 15). However, on August 25, 2016, plaintiff filed a grievance - AUB-69938-16 - in which he complained that his property was not given to him when he was brought to SHU on August 18, 2016, after defendant Regner issued the misbehavior report. (Parmiter Decl. ¶ 16 & Ex. D). A review of the grievance shows that it is coherent, detailed, and expresses great concern for his property. (Parmiter Decl. Ex. D). In fact, plaintiff went to great lengths to list each item of missing property, together with the cost of each item. (Ex. D at 1-3). Plaintiff also claimed that the officer who packed the property, C.O. Thomas, "purposely discarded everything that was of value to me." (*Id.* at 4). There is no mention of the alleged assault or the incident which was the reason that plaintiff was brought to SHU on August 18, 2016. The IGRC investigated plaintiff's allegations and sent the findings to plaintiff on September 1, 2016. (*Id.* at 5-6).

Defendant has also filed the declaration of Rachael Seguin, the Assistant Director of the IGP for the New York State Department of Corrections and Community Supervision ("DOCCS"). (Seguin Decl.) (Dkt. No. 36-6). Assistant Director Seguin is the custodian of the records maintained by the CORC. (Seguin Decl. ¶ 3). Her records reflect that plaintiff was incarcerated at Auburn from March 16, 2015 until September 22, 2016. (Seguin Decl. ¶ 14). Assistant Director Seguin's records show that, from 2015 until the date of Seguin's declaration, the plaintiff appealed a total of four grievances to the CORC, including two grievances that plaintiff filed at Auburn prior to

the August 18, 2016 incident. (Seguin Decl. ¶ 14 & Ex. A).

Assistant Director Seguin's Exhibit A shows that, on October 10, 2015, while incarcerated at Auburn, plaintiff filed a grievance complaining about disciplinary policies, and that on June 1, 2016, plaintiff filed a grievance complaining about a search and seizure. (Seguin Decl. Ex. A at 2).  Each of these grievances was appealed to the CORC.  On December 27, 2016, after plaintiff was moved to Southport Correctional Facility, he filed a grievance related to religion, and on September 26, 2017, plaintiff filed a grievance relating to "staff conduct." (*Id.*)  Each of these grievances was appealed to the CORC.  However, there are no appeals of any grievances relating to the alleged assault by defendant Regner which, according to plaintiff, occurred on August 18, 2016.  The court notes that it appears that plaintiff did not appeal the August 25, 2016 property-related grievance to the CORC.

It is clear that plaintiff was well aware of the grievance program and its appeal procedures, using them before and after the incident in question.  It is also clear from the records that plaintiff did ***not*** file a grievance regarding the alleged assault by defendant Regner on August 18, 2016.  Thus, defendant has shown that plaintiff failed to exhaust his administrative remedies with respect to the alleged August 18, 2016 incident.

Plaintiff does not seriously oppose the defendant's argument.  Rather, plaintiff claims that the grievance program was "unavailable" to him, excusing his failure to exhaust.[5]  In his response to defendant's motion, plaintiff claims that he attempted to

---

[5] At his deposition for this case, plaintiff conceded that he was aware of the grievance procedure and how to use it. (Pl.'s Dep. at 18-28) (Dkt. No. 36-2).  Plaintiff testified that he was also

file a grievance regarding the incident "several times," but received no response. (Pl.'s Resp. at 3). Plaintiff claims that he tried to file a grievance on August 18, 23, 25, and 31, 2016.[6] (*Id.*) On September 1, 2016,[7] when plaintiff attempted to question the lack of IGRC response, an unidentified officer told plaintiff that he would not eat or drink for a week if he pursued his grievances complaining about the incident. (*Id.* at 4). Plaintiff also claims that he attempted to file grievances at each of two facilities in which he was incarcerated after Auburn, but he was told that he could not file a grievance complaining about an incident that occurred at a different facility.[8] Plaintiff never actually tried to file a grievance which was rejected by the IGRC at his subsequent facilities due to the incident occurring at Auburn, even though in his complaint he alleges that "the second time" he tried to file a grievance, "they" told him that the "time limit was over." (Compl. at 5).

At his deposition, plaintiff insisted that he tried to file several grievances regarding the incident in question, but none of them were answered. (Pl.'s Dep. at 107-

---

aware of the concept of "exhaustion of administrative remedies." (*Id.* at 25-28).

[6] In his complaint, plaintiff states that he filed a grievance, and he "did not receive a response at first and the second time they said the time limit was over (attached)." (Compl. at 5). Plaintiff never stated that he received no response to three different grievances, and there is no mention of any threats by corrections staff.

[7] There is no date in plaintiff's response to the motion for summary judgment. However, during his deposition, he testified that he spoke to the unidentified sergeant on September 1, 2016. (Pl.'s Dep. at 120).

[8] Plaintiff states that he attempted to file a grievance at Five Points Correctional Facility and one at Southport Correctional Facility. (Pl.'s Br. at 4).

122).  Plaintiff claimed that he tried to file a grievance on August 18, 25, and 31.[9] (Pl.'s

Dep. at 107, 109).  Plaintiff first stated that he placed the grievances in a mailbox, but

then changed his testimony to state that he gave the grievance to the guard. (Pl.'s Dep.

at 107-108).  Plaintiff states that when he failed to get a response to his first grievance,

which was sent on August 18th, he filed another grievance on August 25, 2016.  A

grievance, dated August 25th was filed and addressed.  However, there was no mention

of the alleged assault by defendant Regner in plaintiff's August 25th grievance.

(Palmiter Decl. Ex. D).  The August 25th grievance only referred to the property that

plaintiff alleges was missing after his move to SHU on August 18. (*Id.*)

The August 25th grievance was received and addressed, even though plaintiff

claimed that one of the officers intentionally lost or destroyed plaintiff's property.  In

plaintiff's response to the motion for summary judgment, plaintiff now claims that the

prison officials lost his property in order to "lose the evidence" of defendant Regner's

spit, which would have been found, inter alia, on the bed sheets. (Pl.'s Br. at 12-13).

Other than stating that he believed that the property was lost "intentionally," none of

these facts were included in the grievance that plaintiff filed on August 25th.  In

addition, plaintiff testified that all of his grievances were sent in sealed envelopes (Pl.'s

Dep. at 111), thus, it would be difficult for any of the officers to know what was in the

---

[9] At plaintiff's deposition, he did not mention his attempt to file a grievance on August 23rd that he now asserts in his response to the defendant's motion for summary judgment.  Thus, in the complaint, plaintiff alleged that he filed two grievances regarding the incident, at his deposition, he claimed he filed three grievances, and in his response to defendant's motion for summary judgment, the number of grievances rose to four.

grievance.[10]  If plaintiff were as upset about the incident as he claims to have been, it is unclear why he would not have included the relevant facts in his August 25th grievance, particularly because plaintiff now claims that his property was lost or destroyed in order to cover up evidence of the assault.  Plaintiff did not testify that he filed two grievances on August 25th, and that one was addressed, but the other was ignored, lost, or destroyed.  In any event, plaintiff did not appeal the result of his August 25th grievance.

Plaintiff states that when he realized that he was not getting a response to his grievances, he asked an unknown sergeant, but claims that the unidentified sergeant threatened him.  This alleged threat "prevented" him from pursuing his grievances. Plaintiff submits that his attempts to file grievances after he was transferred out of Auburn shows that he was deterred by the sergeant's threat from following up on the failure of prison officials at Auburn to respond to his grievances. (Pl.'s Exs. at 19-20) (Dkt. No. 38-1).

In *Ross v. Blake*, the Supreme Court made it clear that if prison administrators "thwart" inmates from taking advantage of the grievance process through "machination,

---

[10] The regulations specifically provide that inmates in SHU status will be provided grievance forms and that "[e]nvelopes will be given to inmates for use in forwarding their completed grievance forms to the IGP office. *The sealed envelopes will assure the confidentiality of the inmate's complaint while enroute to the IGP office.*" 7 N.Y.C.R.R. § 701.7(a)(2) (emphasis added).  This section further provides that "[a]rea supervisors will *ensure that the completed grievance forms are placed in sealed envelopes, collected and forwarded to the IGP office.*" *Id.* § 701.7(a)(3) (emphasis added).  Finally the regulations provide that, where available, "SHU inmates shall use centrally located IGP deposit boxes to send grievance forms and IGP correspondence to the IGP office.  These boxes shall be kept locked at all times." *Id.* § 701(b).  The IGP supervisor and staff representatives (IGRC sergeant/officer) *will have the only keys to these boxes and will collect their contents at least two times per week.*" *Id.* (emphasis added).  Thus, it appears unlikely that grievances may be tampered with or lost if the regulations are being followed.  Plaintiff conceded at his deposition that the envelopes in which he placed his alleged grievances were sealed and that he either put the envelope in the "box" or he gave it to the guard. (Pl.'s Dep. at 107-108, 111).

misrepresentation, or intimidation," the administrative remedy will be considered "unavailable." 136 S. Ct. at 1859-60.  However, the Second Circuit has recently reaffirmed that where there has been no affirmative action by prison staff actually preventing prisoners from pursuing administrative remedies, those remedies are not unavailable under the PLRA. *Grafton v. Hesse*, No. 17-3346, __ F. App'x __, 2019 WL 4071753, at *1 (2d Cir. Aug. 29, 2019) (citing *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006)).

In *Grafton*, although plaintiffs alleged that prison officials put them "'under threat of retaliation,'" they admitted to filing subsequent grievances. *Id.*  Thus, the court held that "staff members' intimidation had not made the prison grievance system unavailable to Grafton." *Id.*  In addition, a general fear of retaliation is insufficient to render the grievance process unavailable. *Lapierre v. LaValley*, No. 9:15-CV-1499, 2019 WL 4015689, at *6 (N.D.N.Y. Aug. 26, 2019) (Rep't-Rec.) (citing *Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009)).

While the "general fear of retaliation" is insufficient to render administrative remedies unavailable, specific threats may be sufficient to show that the remedy was unavailable. *Adams v. O'Hara*, No. 9:16-CV-527, 2018 WL 5728040, at *6 (N.D.N.Y. July 24, 2018) (citations omitted), *Rep't Rec. adopted*, 2018 WL 4590015 (N.D.N.Y. Sept. 25, 2018).  Plausible allegations of specific threats may create a material issue of fact as to whether the defendant officer may rely upon the inmate's non-exhaustion as an affirmative defense.  In *Adams*, I recommended denying the defendants' motion for summary judgment based upon plaintiff's allegation that his remedies were unavailable,

in part, due to his claim that a correctional sergeant ripped up plaintiff's grievance in front of him and threatened him not to further pursue the grievance. 2018 WL 5728040 at *3-7. Prior to trial, Chief Judge Suddaby held an evidentiary hearing to resolve the exhaustion issue, concluding that plaintiff had failed to support his claim that administrative remedies were not "available," and dismissing the action for failure to exhaust.[11] *Adams v. O'Hara*, No. 9:16-CV-0527, 2019 WL 652409 (N.D.N.Y. Feb. 15, 2019). Thus, while sufficient to overcome a motion for summary judgment, Mr. Adams failed to support his factual claims at an evidentiary hearing. *Id.*

While this court has serious doubts about the validity of plaintiff's exhaustion argument,[12] I will not recommend that the court grant summary judgment on this basis. Plaintiff alleges that when he approached a sergeant about his attempts to file a grievance regarding the alleged assault, the officer threatened him by stating that he would not eat or drink for a week if he pursued the matter, and plaintiff claims that he did not attempt to file any grievances thereafter until he was moved to another facility. Plaintiff has also produced what he asserts are copies of the grievances relating to the assault that he attempted to file, but which were ignored. (Pl.'s Exs.) (Dkt. 38-2 at 7 -

---

[11] Chief Judge Suddaby ultimately found, inter alia, that plaintiff had failed to provide any credible evidence that while he was incarcerated at Auburn, he submitted a grievance that was torn up or that a corrections officer threatened him to cease pursuing. 2019 WL 652409, at *5.

[12] Defendant cites *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) in support of his argument that plaintiff's inconsistent and contradictory allegations regarding his "attempts" at filing grievances complaining about the incident should entitle him to summary judgment. Although the court agrees that plaintiff's arguments are inconsistent and often appear to be made in order to embellish his claims based on the defendant's argument that plaintiff's allegations are insufficient, the court will decline to recommend granting summary judgment on exhaustion grounds because plaintiff has clearly failed to raise a genuine issue of material fact with respect to his Eighth Amendment claim.

14

Grievance dated 8/18/16; 8 - Grievance dated 8/23/16; 9 - Grievance dated 8/31/16).

Plaintiff has also included a copy of the August 25, 2016 grievance, which was

addressed, but which did not complain about the assault.[13] (Pl.'s Ex.) (Dkt. No. 38-2 at

1-6).  Plaintiff did not file any more grievances at Auburn after September 1, 2016.  In

order to find in defendant's favor on this issue, the court would be placed in the

position of making a fact finding that is inappropriate on a motion for summary

judgment, notwithstanding the factual inconsistencies in plaintiff's allegations.

However, defendant is still entitled to summary judgment because, for the

following reasons, even assuming that plaintiff exhausted his administrative remedies, I

find that plaintiff has not raised a genuine issue of material fact with respect to the

merits of his excessive force claim, even if plaintiff's allegations are assumed to be true

for purposes of the motion.

## IV.    **Excessive Force**

### A.    **Legal Standards**

Inmates enjoy Eighth Amendment protection against the use of excessive force,

and may recover damages under 42 U.S.C. § 1983 for a violation of those rights.

*Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a

plaintiff must still establish the objective and subjective elements of an Eighth

---

[13] The court does note that one of the exhibits in plaintiff's response is a document entitled "Affidavit of Exhausting All Administrative Remedies." (Dkt. No. 38-2 at 19-20).  The document is notarized and dated December 15, 2016.  In this document, plaintiff states that he only filed a grievance on August 23, 2016, and that he was threatened on September 1, 2016, after he failed to get a response and inquired about the status of the grievance. (*Id.*)  The officer allegedly told plaintiff that "the next time" he filed a grievance against one of the officers, plaintiff would not eat or drink for a week. (*Id.* at 19).  In the sworn statement, plaintiff did not mention any of the other grievances that he now claims he filed.

Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a

malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

## B.    Application

This court finds that plaintiff has not established a genuine issue of material fact with respect to the objective prong of the Eighth Amendment violation.  As discussed below, the force allegedly used was, at most, de minimis, and plaintiff has not shown that the defendant's alleged actions violated any contemporary standards of decency or were repugnant to the conscience of mankind.[14]

In this case, plaintiff argues that defendant Regner's alleged actions at 2:00 a.m. on August 18, 2016 rose to the level of an Eighth Amendment violation.[15]  Plaintiff originally claimed only that defendant Regner was "upset" because plaintiff was convicted of a crime that defendant Regner "disliked," and he told plaintiff so. (Compl. at 5).  Plaintiff alleges that after defendant Regner took the blanket down from

---

[14] This court makes no finding that defendant Regner engaged in any of the conduct that plaintiff alleges.  The court is assuming the facts for the purpose of the summary judgment motion and finds that, even if defendant engaged in the conduct alleged by plaintiff, he has failed to overcome the summary judgment standard.

[15] Plaintiff initially asserted that defendant's actions constituted a "Failure to Protect." (Compl. at 5).  However, plaintiff's factual assertions are more properly interpreted as an assertion of excessive force or cruel and unusual punishment under the Eighth Amendment.

plaintiff's cell opening,[16] he spit on plaintiff "multiple times," then "came back" and threw an unknown green substance on him, which "immediately" irritated and burned plaintiff's skin, resulting in discoloration, itching, and a rash. (*Id.*)

At plaintiff's deposition, the plaintiff's claim of verbal harassment escalated substantially, alleging that defendant Regner engaged in extensive racial epithets and announced that plaintiff was a rapist and a pedophile. (Pl.'s Dep. at 46-47, 49, 51). Plaintiff stated that defendant Regner spit at him while plaintiff was using the bathroom, and that the "evidence of saliva" was everywhere; on the bed sheet, on plaintiff's towel, on his skin, and "everywhere in his cell. (Pl.'s Dep. at 49).  Plaintiff stated at his deposition that the spit was all over his body, even though plaintiff stated that defendant Regner only spit on or at plaintiff twice. (Pl.'s Dep. at 52).  In fact, plaintiff stated that "they" intentionally threw all his property away because "they knew it was evidence of the saliva all over my property." (Pl.'s Dep. at 52-53).

Plaintiff also testified at his deposition that defendant Regner grabbed a lotion bottle and spilled it on himself by accident.[17] (Pl.'s Dep. at 52-53).  After some additional racial epithets, defendant Regner allegedly walked away. (*Id.* at 54). Defense counsel asked if anything else happened before defendant Regner walked away, and for the first time, plaintiff stated that defendant Regner "tried to throw my

---

[16] Plaintiff testified that he did not "refuse" to take the blanket down, but rather, he did not have time remove the blanket after defendant Regner ordered him to do so because plaintiff was using the toilet at the time and had to finish. (Pl.s Dep. at 49).

[17] Defendant Regner stated that plaintiff threw the lotion on him after the defendant pulled the blanket off the cell door.  One of the charges in the misbehavior report that was issued as a result of the incident was assault on an officer, which consisted of plaintiff throwing the contents of the bottle of lotion on the defendant.  Plaintiff claims that he was "framed."

books at me." (*Id.* at 55).  He allegedly grabbed the books that were on top of plaintiff's locker and tried to throw them through a closed cell door. (*Id.*)  Plaintiff states that "the books did not come through the cell." (*Id.*)

Defendant Regner then walked away, only to return approximately three minutes later. (*Id.* at 56).  Plaintiff testified that he was crying because he was shocked, and he was concerned because defendant Regner had now "exposed" him as a pedophile. (*Id.* at 57).  Although it was 2:00 a.m., plaintiff stated that "some" people on the block were still awake working on their "cases." (*Id.*)  Plaintiff testified that in the three minutes that defendant Regner was away from plaintiff's cell, he had time to put some of his clothes on.[18]  He testified that when defendant Regner came back, plaintiff was standing in front of the toilet, and that he had finished putting his boxers on. (*Id.* at 57-58).

At that moment, defendant Regner allegedly returned with the bottle of green liquid. (*Id.* at 58).  Plaintiff claims that defendant Regner threw the substance at him, uttering more racial and insulting epithets, and spit on plaintiff again. (*Id.* at 59).  Plaintiff testified that the liquid "stinged [sic] the tip of [plaintiff's] skin." (*Id.* at 58) (first alteration in original).  Although plaintiff testified that "everyone" saw the incident, he had no explanation for how this could be so, because all the inmates were in their cells. (*Id.* at 60)  So plaintiff stated that his "neighbor" to the left and to the right saw what the defendant did and told plaintiff that they saw everything that

---

[18] Plaintiff claimed that, even though he was studying at 2:00 a.m., he was naked while using the bathroom.

happened and would "testify" for him.[19] (*Id.*)  However, plaintiff testified that neither of these inmates testified for him because they "just went back to making fun of [him]," calling him a pedophile, and threatening to beat him up.[20] (*Id.*)

Plaintiff testified that defendant Regner took the top off the bottle and threw the green liquid all over plaintiff. (*Id.* at 63).  Plaintiff stated that the liquid hit "all over;" the bed, the walls, his books, and all over plaintiff's body. (*Id.*)  Plaintiff stated that the liquid hit his face, his arms, his head, his legs, his private parts, and his clothes were soaked. (*Id.*)  Plaintiff testified that the substance "tingled" his skin immediately, and his skin began to itch. (*Id.* at 64).  He also stated that a few days after the incident, he began to develop discoloration of his skin, and that he had never had that "type of issue" with skin irritation prior to the August 18th incident. (*Id.*)

Notwithstanding the alleged "immediate" irritation of his skin, plaintiff did not wipe or wash it off because he wanted to "let the sergeant know what was going on." (*Id.* at 65).  Plaintiff stated that he did not know if he should wash it away with soap and water, so he did not wipe it off until he spoke to the sergeant, who told him "hey just use soap and water." (*Id.*)  Plaintiff states that he was then told that he was going to be taken to SHU because defendant Regner accused plaintiff of grabbing the lotion and throwing it on him. (*Id.*)  Plaintiff could not remember the name of the sergeant to

---

[19] Plaintiff did not remember the names of the inmates to whom he was speaking. (Pl.'s Dep. at 60).

[20] Although plaintiff alleges that inmates made fun of, and threatened him as a result of defendant Regner's actions, he does not allege that he was injured or hurt as a result.  Plaintiff was in SHU, and he was transferred to another facility from the SHU approximately one month after the incident in question.

whom he spoke, even though plaintiff testified that he had seen the sergeant "numerous times before." Plaintiff stated that the sergeant was a male with no beard, who was stocky, and had dark hair. (*Id.* at 65-66).

Defense counsel asked whether plaintiff ever thought of wiping the "green stuff" off, and plaintiff testified that he did not want to touch it, even though it was irritating him. (*Id.* at 67). He later testified that the liquid was on his body for "[a]bout an hour" before the sergeant came. (*Id.* at 70). The substance smelled like cleaning solution, and defendant Regner only threw part of the bottle on him, cursed again, and walked away. (*Id.* at 69). Plaintiff also stated that

> A.    I believe that's what caused it. Me just letting the green substance sit.
> . . .
> A.    I think I – I was the one that caused it . . . . I should have washed it off, but I didn't know any better. . . . I think if I would have washed it off then I wouldn't have the discolorment [sic] of the skin and the skin rash, skin irritation.

(Pl.'s Dep. at 70-71).

The court first notes that, notwithstanding plaintiff's attempt to embellish the verbal harassment and the affect that it had on his mental status,[21] verbal harassment alone, without any injury or damage, is not actionable under section 1983, no matter how inappropriate, vulgar, or repugnant it may be. *Williams v. Dubray*, 557 F. App'x 84, 86 (2d Cir. 2014) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Casanova v. Maldonado*, No. 17-CV-1466. 2019 WL 3286177, at *8 (S.D.N.Y. July

---

[21] Plaintiff testified that he sought help from "mental health" as the result of the defendant's actions. (Pl.'s Dep. at 101-103).

22, 2019) (citations omitted); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996).

Plaintiff's allegation that defendant Regner spit on him also fails to rise to the level of an Eighth Amendment violation. As defendant argues, the force alleged was de minimis. It has been held that a single incident of spitting does not constitute excessive force. *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 348 (N.D.N.Y. 2010) (citing *Greene v. Mazzuca*, 485 F. Supp. 2d 447, 451 (S.D.N.Y. 2007) (holding that yelling, spitting at, and threatening an inmate do not rise to the level at which the constitutional bar is set to establish cruel and unusual punishment); ; *Headley v. Fisher*, No. 06-CV-6331, 2008 WL 1990771, at *14 (S.D.N.Y. May 7, 2008) (holding that spitting in plaintiff's face, slapping and pushing twice did not give rise to the claim of excessive force)).

Plaintiff attempts to embellish his claim by asserting that the spit was all over plaintiff and his cell. However, this allegation defies belief, given plaintiff's own description of the incident. Plaintiff claims that defendant Regner spit on him two or three times, and that plaintiff was first on his toilet and later, standing in front of the toilet which was eight steps away from the cell door. The cell door was locked during the entire incident. Defendant Regner would have to have spit quit a long way and an incredible amount to have covered plaintiff's body and all the property in his cell.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains

specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,* 2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

Plaintiff's account of this incident is exactly the type of claim that the decision in *Jeffreys* was meant to address. Even assuming that spitting at an inmate rose to the level of a constitutional violation, which it does not, plaintiff's account of the incident is unsubstantiated and inconsistent with his initial allegations. In fact, although never mentioning it in the complaint, plaintiff testified at his deposition that defendant Regner unsuccessfully tried to throw books at the plaintiff,[22] and that defendant Regner actually spilled the lotion on himself after grabbing it out of plaintiff's locked cell.

Finally, throwing a substance that "smelled" like disinfectant does not rise to the level of a constitutional violation. Even assuming that defendant Regner did throw

---

[22] Plaintiff testified that they were soft cover books, and they did not hit him because they "hit the gate." (Pl.'s Dep. at 55)

green disinfectant cleaner on plaintiff, he asserts that he would not have suffered the injuries if he had just washed the liquid off when the incident first occurred instead of waiting an hour so that the sergeant could see what defendant Regner had allegedly done. Clearly, if the substance (assuming that there was a substance) were burning plaintiff and making his skin itch as he states, he would not have simply decided to wait for the eventual arrival of a sergeant in the middle of the night. His statement that he did not "know any better" defies belief. If the substance was not painful enough or irritating enough to wash off, clearly, defendant Regner's conduct was not repugnant to the conscience of mankind.

In *Tafari*, plaintiff claimed that the defendant threw urine and feces on plaintiff. 714 F. Supp. 2d at 341. The court held that "this conduct, while certainly repulsive, is not sufficiently severe to be considered 'repugnant to the conscience of mankind.'" *Id.* (citations omitted). If throwing urine and feces on a plaintiff is not repugnant to the conscience of mankind, then throwing a bottle of a liquid which "smelled" like disinfectant would not rise to that level. Although plaintiff takes great pains to prove that he was "injured," including submitting medical records, allegedly evidencing the resulting skin impairment, he also conceded at his deposition that he might not have had the problems if he had just washed the substance off immediately. (Pl.'s Dep. at 70-71). Thus, even if most of plaintiff's allegations are credited, no reasonable fact finder could determine that the defendant's alleged conduct in this case shocked the conscience and rose to the level of an Eighth Amendment violation.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 36) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE ON THE MERITS**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: September 26, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge